**ZIP DEE, INC., Plaintiff,**

v.

**DOMETIC CORPORATION, Defendant.**

**No. 93 C 3200.**

United States District Court,
N.D. Illinois,
Eastern Division.

May 30, 1996.

Harry M. Levy, James J. Hill, Emrich & Dithmar; George McAndrews, Stephen F. Sherry, and Patrick J. Arnold, McAndrews, Held & Malloy, P.C., for Plaintiff.

William G. McGuinness, David C. Radulescu, Fried, Frank, Harris, Shriver & Jacobson; Peter V. Baugher, and Kenneth E. Kraus, Schopf & Weiss, for Defendant.

### *MEMORANDUM OPINION AND ORDER*

SHADUR, Senior District Judge.

During this action's three-year life (by sheer chance this opinion has been dictated on its third anniversary, though it is being transcribed a few days later), the proceedings have been marked by extraordinary bitterness. Even more regrettably, the obvious bad blood between the parties has extended to their counsel as well. That has in turn contributed to the numerous calls made on this Court, first to resolve legal issues and then, as the litigants almost invariably ask, to reconsider rulings at the instance of the loser.[1]

What has now been presented for decision is the belated effort by Dometic Corporation

---

**1.** Westlaw reports the issuance of 10 written opinions before this, three of them published in F.Supp. and the others available only through the electronic retrieval services. This Court has also been called upon to address a number of other disputes by oral rulings.

("Dometic"), at a time when the parties should surely be either at or nearing the preparation of a proposed final pretrial order as the prelude to a prompt trial, to amend its responsive pleading once again by filing not only its Fifth Amended Answer but also an added Counterclaim. Dometic's motion for leave thus to expand rather than to contract the scope of the litigation—to create the legal equivalent of a mathematical divergent series rather than the more appropriate convergent series—is fully briefed and ripe for decision.

Among the earlier rulings in the case was one contained in this Court's extended September 29, 1995 opinion (the "Opinion," 900 F.Supp. 1004), which denied for the most part Zip Dee's motion to strike Dometic's Twelfth Affirmative Defense ("AD 12")—a defense based on the claim that Zip Dee had engaged in inequitable conduct in the course of acquiring its trademark for the overall configuration of its slatted awning cover for recreational vehicles. Until that time Dometic had been on the wrong side of nearly every issue in the case—so much so that this Court's October 11, 1995 memorandum opinion and order, in the course of rejecting Zip Dee's request for reconsideration of the Opinion, said (slip op. at 1–2):

> It may be that Zip Dee is so taken aback at losing on any issue in this litigation (for the most part it has been the prevailing party in the opinions and rulings that this Court has been called upon to issue in this bitterly contested lawsuit) that it believes that this Court must have made a mistake: It said "motion denied" when it really meant to say "motion granted." Or perhaps Zip Dee is exhibiting the litigation strategy that this Court decried in *Quaker Alloy Casting Co. v. Gulfco Inds., Inc.*, 123 F.R.D. 282, 288 (N.D.Ill.1988):

> [T]his Court's opinions are not intended as mere first drafts, subject to revision and reconsideration at a litigant's pleasure. Motions such as this reflect a fundamental misunderstanding of the limited appropriateness of motions for reconsideration.[2]

■ On April 8, 1996—more than six months after issuance of the Opinion and, far more significantly, *more than two years* after it had first filed AD 12 as part of its *Second Amended Answer*—Dometic filed its motion for leave to file its Fifth Amended Answer and Counterclaim, the motion now under consideration. Yet in principal part the proposed Counterclaim draws from the very same well as Dometic's long-asserted AD 12—indeed, Dometic's Motion at 1 expressly acknowledges that "[t]his counterclaim is based on the same facts as those already presented in Dometic's Twelfth Affirmative Defense ('AD 12')...."[3]

What does Dometic say to justify its delay in a situation in which for over two years it has concededly been in possession of at least substantially all (if not in fact all) of the facts required to file that claim? Its initial motion was conspicuously silent on that score. Then after Zip Dee had filed its memorandum in opposition, Dometic's R.Mem. 7–8 has offered this purported justification:

> Zip Dee assumes that "Dometic has known all along" the facts on which it bases its counterclaim and that Dometic could have brought its claim earlier in this action. *Zip Dee Brief* at 10. That is not the case. It was not until Dometic was conducting its U.S. Patent Office prior art search for utility patents relating to Zip Dee's trademarked slatted metal cover (in the course of preparing its recent Motion For Partial Summary Judgment On Trademark In-

2. [Footnote by this Court] Dometic should have quit while it was ahead (at least transiently so). It almost immediately returned to its habitual position as the advancer of untenable positions (see this Court's November 16, 1995 opinion reported at 905 F.Supp. 535), and it has now followed the same course with the present doomed-to-fail motion.

3. Side-by-side comparison of the newly-proposed Counterclaim with AD 12 as it was originally presented (comprising fully five typewritten pages) discloses that Dometic's complaints in the Counterclaim as to Zip Dee's asserted inequitable conduct before the Patent and Trademark Office essentially tracks what Dometic asserted in the original AD 12 back in March 1994. And to the extent that the proposed Counterclaim fleshes out that claim, much of what is now alleged by Dometic was unquestionably known to it and to its predecessor A & E Systems, Inc. when AD 12 was initially filed.

fringement Claims) that Dometic discovered the compelling grounds for Dometic's counterclaim—the overwhelming proof that the alleged trademark was functional and well-known to be so. Dometic's motion makes absolutely clear that no reasonable person would have thought that a slatted metal cover could serve as an exclusive and proprietary trademark. Accordingly, Dometic cannot be faulted for bringing its counterclaim at this time because it only recently discovered the compelling grounds for the claim.

But that is extraordinarily unpersuasive, so much so that it appears to border on the disingenuous—if indeed it has not crossed that border. Dometic seeks to obscure the already-quoted contention that was contained in its own motion, which in the course of stressing its position that little delay will be occasioned by the current injection of its claim (in the same vein, Dometic's Motion at 2 said that it "anticipates a very limited amount of discovery unique to the proposed counterclaim") confessed that the Counterclaim is based on the same facts on which Dometic originally presented AD 12 more than two years earlier.[4]

[redacted] But there is more. In the course of upholding AD 12 over Zip Dee's objections, Opinion at 1009 identified three essential elements of the inequitable conduct defense. In so doing, Opinion at 1009 n. 8 referred to a number of cases that set out not only the three factors to which this Court had referred but also the factors of (1) reasonable reliance on the misrepresentation constituting the inequitable conduct and (2) damages proximately resulting from such reliance. Then Opinion, *id.* went on to say (emphasis added):

> There is no reason, however, why the final two requirements need to be included. As discussed later, the reliance requirement is subsumed by the test for materiality. *And proof of damages flowing from the reliance is completely irrelevant to an inequitable conduct defense.*

That means that an affirmative *defense* based on such inequitable conduct may make the trademark procured through that conduct unenforceable without any need to prove detrimental reliance and consequent damages.

By sharp contrast, of course, a sine qua non for Dometic's proposed *Counterclaim* is its proof of injury—of damages—flowing from Zip Dee's asserted misconduct. And as might be expected, each of Dometic's proffered claims (Counterclaim ¶ 88 in Count I, Counterclaim ¶ 92 in Count II, Counterclaim ¶ 96 in Count III and Counterclaim ¶ 100 in Count IV) alleges "injury to its [Dometic's] business and property, including but not limited to the costs and expenses of this action."[5] That difference really puts the lie to Dometic's effort to portray the Counterclaim as involving no real impact on the litigation in terms of the scope of required discovery, the scope of the required evidentiary presentation and (relatedly) the consequent delay involved. What Dometic seeks to gloss over with its contention that the proposed Counterclaim would call for little added discovery—clearly referring only to *its own* need for discovery—is the obvious need for Zip Dee to launch extensive discovery going to the damages issue (even apart from the needed discovery on liability-related matters).

So there is no question that, despite Dometic's protestations to the contrary, to allow its Counterclaim at this point would be to cause a meaningful expansion of the scope of required discovery and a further delay in getting this case to trial. In that respect this action has now joined the small handful of

4. As indicated earlier, Zip Dee sought unsuccessfully to have AD 12 stricken and then, after it had lost that battle, requested reconsideration by this Court. Are Dometic's lawyers really telling this Court that AD 12 was actually tendered and fought over so bitterly *before* Dometic had the factual basis for advocating it? Dometic cannot have it both ways: When in early 1994 it had sufficient information and evidence (under the objective good faith standard of Fed.R.Civ.P. ("Rule") 11) to justify injecting Zip Dee's claimed inequitable conduct into the case as an AD, by definition it possessed the same objective good faith basis for advancing a counterclaim based on the identical inequitable conduct.

5. Although only Count II ¶ 92 and Count IV ¶ 100 also advert to attorneys' fees as damages, Dometic's prayer for relief in the Counterclaim includes such fees as part of the relief sought under each of the four counts.

cases on this Court's calendar (just 3% of the total calendar) that, having reached the three-year-old mark, are subject to the statutory requirement of public reporting under 28 U.S.C. § 476(a)(3). Although of course no talismanic significance is to be attributed to a lawsuit's passing its third anniversary, the enactment of that provision as part of the Civil Justice Reform Act of 1990 is one of the indications of Congress' deep concern (one that the courts have long held) that justice delayed may be justice denied.[6]

This Court is of course keenly mindful of the Rule 15(a) directive that "leave [to amend pleadings] shall be freely granted when justice so requires" and of the *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962) explication of that directive. But neither of those calls for the issuance of a blank check to the litigant such as Dometic. Numerous cases such as *Tamari v. Bache & Co.,* 838 F.2d 904, 909 (7th Cir.1988), *Perrian v. O'Grady,* 958 F.2d 192, 194 (7th Cir.1992) and *Johnson v. Methodist Med. Ctr. of Ill.,* 10 F.3d 1300, 1304 (7th Cir.1993) regularly repeat the teaching of *Foman* that undue delay, or undue prejudice to the opposing party, or both are appropriate bases for denying leave to amend in the district court's discretion—indeed, Dometic's R.Mem. 2 surprisingly cites *Mitchell v. Collagen Corp.,* 67 F.3d 1268, 1273 (7th Cir.1995) in purported support of its motion, even though that case (*id.* at 1274) actually *denied* leave to file an amendment where, as here, the movant provided no satisfactory explanation for having delayed in filing after essential facts supporting the claim were already known.

What has been said up to now confirms the existence of undue delay on Dometic's part and undue prejudice to Zip Dee by pushing back the time of resolution of Zip Dee's own claims. To look at the problem from a procedurally different but conceptually related perspective, suppose that Dometic—instead of offering up its proposed Counterclaim—were to exercise its undoubted prerogative of filing a separate lawsuit embodying the inequitable conduct claim.[7] That lawsuit would be assigned at random to one of the judges on this District Court and would then have to make its own way toward trial, leaving *this* far-advanced litigation free to reach the trial stage on its own timetable, unencumbered by Dometic's new claim. And if Dometic sought instead to have the case reassigned to this Court's calendar on relatedness grounds (see this District Court's General Rule ("GR") 2.31), that motion would by all rights be denied because of Dometic's inability to satisfy perhaps the most important of the GR 2.31 B preconditions to such reassignment (*each* of which a movant for reassignment must establish):

> (3) the earlier case has not progressed to the point where designating a later filed case as related would be likely to delay the proceedings in the earlier case substantially; and
>
> (4) where a finding of relatedness is requested on the basis of common questions of law, such questions are complex or numerous; or where such a finding is requested on the basis of common questions of fact, such questions are susceptible of resolution in a joint hearing.[8]

One other point, though obviously not controlling, is worth making. It is established law that "[t]he disputed issues of fact underlying the issue of inequitable conduct are not jury questions, the issue being entirely equitable in nature" (*General Electro Music Corp. v. Samick Music Corp.,* 19 F.3d 1405, 1408 (Fed.Cir.1994); *Paragon Podiatry Lab., Inc. v. KLM Labs., Inc.,* 984 F.2d 1182, 1190 (Fed.Cir.1993)). Though that question has typically arisen in the context of an inequita-

6. It is no accident that 28 U.S.C. § 476, a product of the 1990 enactment, is part of the chapter of Title 18 that mandates every district court to develop and implement a "civil justice expense and delay reduction plan" (*id.* §§ 471–482).

7. No opinion is expressed for this purpose as to whether one or more of Dometic's proposed theories of recovery might be unavailable or unavailing for one reason or another.

8. [Footnote by this Court] This District Court now has pending for proposed future adoption an amendment of that last criterion to read simply "the cases are readily susceptible of disposition in a single trial," an amendment that is before our Advisory Committee for Local Rules for consideration. As can be seen from the proposed change in language, the views expressed in this opinion would continue to apply if the revision were adopted.

ble conduct defense to the enforceability of a patent or trademark, as it did in the just-cited cases, the same principle should also apply with equal force to Dometic's putative claim based on such conduct. By contrast, Zip Dee's claims against Dometic are the subject of a jury demand. Thus if Dometic's Counterclaim were to be shoehorned into this litigation, the evidentiary presentation during the trial of the case would seem likely to be further complicated by the need to exclude the jury from a good deal more of the evidentiary presentation—thus providing added (and needless) complexity.

Finally, it should be added that this Court has also reviewed and considered Zip Dee's additional contentions in support of the conclusion announced here (discussed at Zip Dee's Mem. 2–9). Those arguments have varying degrees of force, some being highly persuasive and others less so. Under the circumstances here it is unnecessary to lengthen this opinion by discussing them. Suffice it to say that the more persuasive of the added contentions further buttress the conclusion that this Court has reached, based on what has already been said here. In sum, Dometic's present motion should be and is denied.